UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | ) | |
| ROBERT KEITH BENDER | ) | |
| 23882 Vandenberg Lane | ) | |
| Bozman, MD 21612 | ) | COMPLAINT |
| | ) | FILED **UNDER SEAL** |
| Plaintiff, | ) | PURSUANT TO |
| | ) | 31 U.S.C. §3730(b)(2) |
| BRINGING THIS ACTION ON BEHALF | ) | |
| OF THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| UNITED STATES ATTORNEY | ) | |
| Judiciary Center Building, | ) | |
| 555 Fourth Street, NW, | ) | |
| Washington, 20530 | ) | **JURY TRIAL** |
| | ) | **DEMANDED** |
| and | ) | |
| | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE UNITED STATES | ) | |
| U.S. Department of Justice | ) | |
| 10th and Constitution Avenues, N.W. | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NORTH AMERICAN | ) | |
| TELECOMMUNICATIONS INC. (NATI) | ) | |
| 9015 Rhode Island Ave., | ) | |
| College Park, MD 20740 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHANG D. HWANG | ) | |
| 9015 Rhode Island Ave., | ) | |
| College Park, MD 20740, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN G. CAROTHERS | ) | |
| 4009 Chaco Road | ) | |
| Alexandria, VA 22312 | ) | |

and                                             )
                                                )
CAPITOL TECHNOLOGY SERVICES INC.                )
3703 Benning Road, NE                           )
Washington DC 20019,                            )
                                                )
and                                             )
                                                )
HEYS S. HWANG                                   )
3703 Benning Road, NE                           )
Washington DC 20019.                            )
                                                )
and                                             )
                                                )
JAMES W. RUEST                                  )
12916 Chestwood Lane                            )
Bowie, MD 20715205                              )
                                                )
and                                             )
                                                )
PAE GOVERNMENT SERVICES INC.                    )
888 South Figueroa Street, Suite 1700           )
Los Angeles, CA 90017-5466                      )
                                                )
                            Defendants.          )
_____)

This is a *qui tam* action under 31 U.S.C. § 3729, *et al.* of the False Claims Act filed

by Relator/Plaintiff Robert Keith Bender, in the name of the United States

Government and Mr. Bender, to recover penalties and damages arising from

Defendants' violations of contract requirements and misrepresentations as to work

conducted pursuant to contracts with the United States Department of Agriculture for

Operations and Maintenance on buildings in Washington, DC.  Damages to the

United States include, but are not limited to, the full value of the contracts for

Operations and Maintenance held by the Defendants. Damages also include the costs

to repair and the physical damages to buildings and equipment as a result of the

actions of the Defendants as detailed below.

## JURISDICTION AND VENUE

1.  Plaintiff, Robert Keith Bender, of 23882 Vandenberg Lane, Bozman Maryland, hereby alleges causes of action under 31 U.S.C. §§ 3729, *et. al.* of the False Claims Act, arising from Defendants' misrepresentations and failure to satisfy ongoing contract requirements relating to contracts for Operations and Maintenance for the United States Department of Agriculture.

2.  There has been no public disclosure of the allegations contained in this complaint with respect to the contracts held by Capitol Technology Services, Inc. ("CTSI") or work conducted on the building by subcontractors pursuant to contracts held by CTSI.

3.  Plaintiff is the original source of all the allegations contained in this complaint.

4.  Plaintiff has direct and independent knowledge of the allegations in this complaint specifically with regard to the allegations arising from the contracts held by the North American Telecommunications, Inc. ("NATI").

5.  There has been a public disclosure with respect to many of the allegations regarding the defendants actions arising from the contracts held by NATI.

6.  See below section on disclosures for the Plaintiff's role in bringing those allegations to the attention of the government as he was the source of information which was investigated by the Office of the Inspector General.

7.  Pursuant to the requirements of the False Claims Act 31 U.S.C.§ 3729 *et. seq.*, the plaintiff has provided the government with a confidential disclosure statement and exhibits to substantiate his allegations.

8.   Jurisdiction over all stated causes of action is conferred upon this court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

9.   Defendant, North American Telecommunications Inc ("NATI"), 9015 Rhode Island Ave., College Park, MD 20740 held the contract for Operations and Maintenance of the Department of Agriculture Buildings from October 1, 1997 to March 31, 2003.

10.  Defendant, Chang D. Hwang, 9015 Rhode Island Ave., College Park, MD 20740, has been the President of North American Telecommunications Inc. (NATI) since 1984. Between October 1, 1997 and March 31, 2003, his company was responsible for the Operations and Maintenance of the USDA complex.

11.  Defendant, John G. Carothers, 4009 Chaco Road, Alexandria, VA 22312, was the Operations Coordinator for NATI and CTSI and has worked on the USDA site since October 1983.

12.  Defendant, Capitol Technology Services, Inc. ("CTSI"), 3703 Benning Road, NE, Washington, DC 20019, phone (202) 398-6000, currently holds the contract for Operations and Maintenance at the USDA site, which it took over on April 1, 2003.

13.  Defendant, Heys S. Hwang, President of CTSI, 3703 Benning Road, NE, Washington DC 20019.

14.  Defendant, James W. Ruest, 12916 Chestwood Lane, Bowie, MD 20715, is currently Project Manager at Capitol Technology Services, Inc. (CTSI) and was formerly NATI's Project Manager at the USDA complex.

15.    Defendant, PAE Government Services, Inc., ("PAE") 888 South Figueroa Street, Suite 1700, Los Angeles, CA 90017-5466 is subcontractor of CTSI to provide electrical work.

16.    Defendant, Don Swenson, Vice President of Operations at PAE.

17.    Defendants were or are in the business of providing Operations and Maintenance services and equipment at the building complex which houses the United States Department of Agriculture in Washington, DC.

18.    The allegations contained herein arise from activities taking place in Washington, DC.

19.    Jurisdiction and Venue are proper in Washington, DC.

## THE PARTIES INVOLVED

20.    The allegations above are hereby restated fully as set forth above.

21.    Robert ("Keith") Bender, of 23882 Vandenberg Lane, Bozman, Maryland, worked as a "duly qualified" Electrician for Operations and Maintenance for the Facilities Management Division of the Office of Operations, USDA, from 1990 to 2003.

22.    North American Telecommunications Inc. (NATI), 9015 Rhode Island Ave., College Park, MD 20740 held the contract for Operations and Maintenance of the Department of Agriculture Buildings from October 1, 1997 to March 31, 2003.

23.    Chang D. Hwang, 9015 Rhode Island Ave., College Park, MD 20740, has been the President of North American Telecommunications Inc. (NATI) since 1984. Between October 1, 1997 and March 31, 2003, his company was responsible for the Operations and Maintenance of the USDA complex.

24.     John G. Carothers, 4009 Chaco Road, Alexandria, VA 22312, was the Operations
        Coordinator for NATI and CTSI and has worked on the USDA site since October
        1983. His authority includes supervision of Preventative Maintenance (PM),
        Government Authorized Overtime (GOT), Minor Repair Work Orders (MRWO),
        and Service Calls.

25.     Capitol Technology Services, Inc. ("CTSI"), 3703 Benning Road, NE,
        Washington DC 20019, phone (202) 398-6000, currently holds the contract for
        Operations and maintenance at the USDA site, which it took over on April 1,
        2003.

26.     Heys S. Hwang, President of CTSI, 3703 Benning Road, NE, Washington DC
        20019. She is the daughter of Chang Hwang, the President of NATI.

27.     James W. Ruest, 12916 Chestwood Lane, Bowie, MD 20715, is currently Project
        Manager at CTSI and was formerly NATI's Project Manager at the USDA
        complex. Among the duties of the Project Manager is to ensure that the contractor
        satisfies the requirements of the contract and that the shop personnel meet the
        criteria of the collective bargaining agreement.

28.     PAE Government Services, Inc., ("PAE") 888 South Figueroa Street, Suite 1700,
        Los Angeles, CA 90017-5466 is subcontractor of CTSI to provide electrical work.
        PAE employed many former NATI personnel to perform electrical work.

29.     Don Swenson, served as Vice President of Operations at PAE.

## FACTS

## A. INTRODUCTION

30.     The allegations above are hereby restated fully as set forth above.

6

31.    The Plaintiff/Relator, Robert Keith Bender, personally witnessed the fraud and abuse conducted by the defendants pursuant to Operations and Maintenance of the USDA site in Washington, DC. North American Telecommunication Inc. (NATI) knowingly, willfully, and recklessly submitted false claims for reimbursement by falsely reporting work completed, falsely reporting the time it took them to perform work and to respond to requests for maintenance, fraudulently billing for overtime, and fraudulently charging the government for work performed by unqualified workers.

32.    NATI's Operations and Maintenance (O&M) contract for the USDA complex covers four buildings, including Jamie L. Whitten Federal Building, USDA South Building, Cotton Annex, and Yates Building. NATI was responsible for the heating, ventilation, air conditioning, preventive maintenance, plumbing, minor repairs, and day to day building operations of the complex.

33.    Although the contract was bid as a firm fixed priced contract, NATI collected additional funds by making false claims for reimbursable repairs and false claims to collect bonuses for speedy responses and completion of projects, and for unnecessary overtime.

34.    NATI's contract, RFP-00-97-R-10, became effective October 1, 1997 and NATI was awarded the full five years available.

35.    When NATI's contract ceased March 31, 2003, Capitol Technology Services, Inc. (CTSI) undertook the Operations and Maintenance for the USDA complex under RFP-OPPM-R-26.

36.    The two companies are owned by members of the same family. The Relator's information based on his investigation is that CTSI is currently engaged in the same fraud against the Government.

37.    The fraudulent practices perpetrated by the elder Hwang's company, NATI, remain in effect at CTSI, where Hwang's daughter is President.

38.    The Relator first disclosed these violations with respect to NATI to the Government in the fall of 1999, prompting an investigation by the Office of the Inspector General (OIG).

39.    Although the OIG issued Report Hy-2319-9 on November 16, 2001, the Relator is the original source of the information pursuant to 31 U.S.C. 3730 (e)(4)(a).

40.    To qualify as an "original source", 31 U.S.C. 3730 (e)(4)(b) states that a Relator must have both "direct and independent knowledge of the information on which the allegations are based" and must have "voluntarily provided the information to the Government before filing an action."

41.    Mr. Bender satisfies the former requirement because he personally witnessed the routine and systematic violations described in the OIG report, while employed by NATI.

42.    He satisfies the latter requirement because in late fall of 1999 he made a protected disclosure to the Inspector General which prompted the investigation.

43.    There has been no public disclosure of Mr. Bender's allegations regarding CTSI's fraudulent activity and the fraudulent activity conducted by others working at the USDA site since CTSI was awarded the O&M contract nor has there been a

public disclosure of the allegations against NATI for work conducted after the issuance of the OIG report.

**B. FALSIFIED RESPONSE TIMES TO SERVICE CALLS**

44.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

45.     NATI elicited additional funds beyond those specified in the firm fixed price contract by fraudulently claiming monthly bonuses.

46.     The O&M contract provides a reward to the contractor for the months when it meets specific levels of response and completion times for service calls.

47.     However, NATI frequently locked in the times listed on the service call tickets so that they would appear to show an appropriate response time in order to satisfy the bonus requirements and ensure that they received the bonus every month.

48.     Each of the O&M contracts held by both NATI and CTSI require responses to two kinds of service calls- Routine calls and Emergency calls. Inspectors from the Office of Operations (OO) would radio NATI and CTSI personnel to alert them to service calls.

49.     Both CTSI and NATI's contracts require the contractor to respond to Routine calls within thirty minutes and to complete the call within four hours.

50.     The contracts require the contractor to respond to Emergency calls within fifteen minutes during normal working hours and within one hour after normal working hours.

51.     The contractor earns a bonus based on the record of response times. Under NATI's contract, for service calls responded to within fifteen minutes

(emergencies) or 30 minutes (routine) of issuance and completed within four hours, the Government paid NATI an additional 7% of their monthly payment for basic services when the completion rate recorded was 91%--100%. The bonus was 5% for a completion rate of 81% --90%.

52. Since the monthly payment for basic services was $180,411.00, NATI's claim that it earned the 7% bonus secured them an extra $12,628.77 each month.

53. CTSI's contract lowered the bonus percentages to 4% and 2% respectively. However, both contracts maintain the language that "Service call bonuses will only apply when both response times and completion times are met. Service calls not meeting the response and completion times shall be deemed incomplete for bonus purposes."

54. NATI employees routinely locked in response times to service tickets to make it appear as if the service calls were receiving a timely response and completed in a timely manner.

55. The reality is that Routine service calls were often not responded to within 30 minutes and Emergency calls were not responded to within15 minutes.

56. NATI's systematic misrepresentations included broken light fixtures, water fountains, clogged toilets, and any service calls reported during the time immediately preceding lunch.

57. Mr. Bender personally witnessed Kenneth Thayer, NATI's Assistant Project Manager, and his son Daniel Thayer locking the times of the Service Calls in order to make them appear as if they had been completed within the times applicable for a bonus.

10

58.     Relator confronted the two men, but when Bender stated that this practice was illegal, the Thayers' remained silent and avoided giving any response.

59.     The practice of locking in times continued under NATI's management and, according to the Relator's information, continues.

60.     In addition, NATI back-dated Preventive Maintenance cards in order to qualify under work for that month. In a handwritten note, NATI's Operations Coordinator, John Carothers, instructed electrical foreman John Magnanelli to list certain Preventive Maintenance as completed on the last day of that month (July 31st) in order to avoid pushing "the cycle to one month later."

61.     The contractor consistently reported over a 91% response and completion rate, thus earning the highest possible bonus.

62.     Damages to the United States include but are not limited to the full amount of this bonus, earned entirely through fraud, plus a civil penalty of up to $10,000 for every claim made as a timely response which was not timely under 31 U.S.C. §3730.

63.     NATI charged the U.S. Government a total of $909,271.44 by fraudulently claiming entitlement to bonuses which it did not earn.

64.     The Relator's information is that this practice continues under CTSI, which employs the same managers to perform work at the same site and earns bonuses for completion time in a similar fashion.

## C. EXPLOITATION OF MINOR REPAIR WORK ORDERS

65.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

66.    NATI made false claims by misrepresenting non-reimbursable Basic Service repairs to be reimbursable Minor Repairs.

67.    Thus, NATI collected additional money for work they were already contracted to perform.

68.    Indeed, the Relator's most conservative estimate of the amount of money earned under this provision of the contract amounts to at least $1,000,000.

69.    NATI's contract defined a Minor Repair as any unscheduled work required to prevent a failure or a breakdown in a piece of equipment or a system, or to restore a piece of equipment or system after a breakdown, where the cost of labor and materials exceeds $250 and goes up to $10,000.

70.    CTSI's contract altered this threshold to be between $350.01 and $25,000 for labor and materials.

71.    A Minor Repair differs from a Basic Service repair in that Minor Repair Work Orders are directly reimbursable from the government whereas Basic Service work is covered by the terms of the O&M contract and the Contractor is expected to bear the costs.

72.    Reimbursement for Minor Repairs is approved through Minor Repair Work Orders (MRWO).

73.    The MRWO describes the service to be provided, the required completion date, and the price for which the Contractor will be compensated.

74.    NATI was reimbursed $50 per worker per MWRO order.

75.    Bender frequently witnessed NATI inflating the value of small jobs, which should have been completed as Basic Service under the contract, to be worth over $250.

76.    Thus, NATI billed for work that they were already contracted to cover.

77.    In the Monthly Status Report for July 2002, NATI claims to have completed 17 MRWO projects, totaling $58,880.

78.    However, the seven projects highlighted by the Relator did not exceed the threshold to qualify as reimbursable expenses.

79.    NATI knowingly and willfully participated in this fraud as indicated by a memo from Ruest, NATI's Project Manager, to Hwang, NATI's President.

80.    The memo, dated February 6 1998, states "NATI is pushing to get more MRWO because they can 'double dip' the government and make extra money."

81.    The practice continued long after that memo and the Relator's information is that it continues to this day under the contract held by CTSI.

82.    Both contracts specifically forbid accumulating small jobs together in order to reach the $250 threshold through stating, "This dollar threshold applies to each individual repair job that may be required, and may not be accumulated for minor repairs or basic service."

83.    The Relator witnessed NATI personnel routinely grouping small jobs together, thus enabling the total amount of a repair to exceed $250 and allowing NATI to fraudulently request reimbursement. In fact, welding repairs performed by John Van Ness, from welding subcontractor Hurley Boiler Works, were generally accumulated toward an MRWO rather than performed as individual maintenance.

84.    This practice is ongoing as CTSI continues make fraudulent requests for reimbursements.

## D. FALSIFIED QUALIFICATION OF WORKERS

85.  The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

86.  Both NATI and CTSI charged the Government for work performed by workers who did not possess the qualifications required by contract.

87.  The Relator was the only employee in the electrical department who possessed an appropriate license. Thus, all other work for which NATI and CTSI received payment constitutes a misrepresentation to the Government and amounts to a false claim.

88.  NATI's contract required it to maintain minimum levels of key personnel for eight hours per day. NATI was required to provide personnel "licensed by the state, local authority, and/or city local authority in those trades…the Government will not allow personnel who do not possess the appropriate qualifications or license requirements to perform work under this contract."

89.  Under CTSI's contract, electrical mechanics are required to have:

> "…at least five years experience in operating and maintaining of electrical systems in a facility similar in complexity to the USDA headquarters and hold a D.C., Virginia, and/or Maryland electrician's license. The position of Lampist shall be a duly qualified electrician capable of working on 277/480 volt electrical equipment".

90.  Of the four electricians listed on the roster, the Relator was the only one who satisfied the license requirements of the contract.

91.  For example, Michael Zanders has no license and was previously a furniture mover.

92.  Under CTSI's contract the electrical work was performed by a subcontractor which hired many of NATI's old electrical workers to continue on the site. The

subcontractor PAE Government Services, Inc. continued to use unlicensed electricians to perform the work for which licensed electricians were required under the contracts.

93.    Damages to the Government include, but are not limited to, the full value of payment for work that the Government contracted to be performed by licensed personnel.

94.    In addition, every claim for additional payment through overtime and MRWO that lists these unqualified workers is subject to a civil fine of up to $10,000 under the Act.

**E. FRAUDULENT BILLING FOR OVERTIME**

95.     The allegations contained in the above paragraphs are hereby re-alleged fully as set forth above.

96.    NATI and CTSI fraudulently billed the Government for overtime for work that the contracts specifically excluded from overtime.

97.    Both worked under contracts that list specific equipment that cannot be worked on during normal working hours to avoid interfering with Department of Agriculture business.

98.    These tasks must be performed after normal business hours at no additional cost to the government.

99.    The contractors are obligated to shift employees after-hours rather than to bill for overtime.

100.    Relator observed that NATI completely ignored its duty to shift employees and instead billed every maintenance job of the specified equipment as overtime.

101.    Many basic repairs simply cannot be performed during normal business hours, because they would disturb the business of the complex.

102.    For this reason, the Government and NATI agreed in the O&M contract that such basic work needing to be scheduled outside normal business hours would not qualify for reimbursable overtime.

103.    NATI and CTSI agreed to shift employees to work after normal business hours at no additional cost to the government. Both contracts state:

> "The Contractor will not remove equipment from service during normal working hours of USDA occupants for routine maintenance which may affect the productivity of Government employees. This equipment, which is identified as critical, *must be maintained by the Contractor on after hour shifts at no additional cost to the government*."

104.    NATI lists the equipment at Section J, 2105A Summary – Annual Man-Hour Requirements and CTSI lists the equipment at Section C, Attachment 7 of the RFP. This equipment includes, but is not limited to, air conditioning units, doors, kitchen equipment, lighting, valves, and water filtration systems.

105.    Rather than shift employees schedules to perform the maintenance on this equipment as the contract required, NATI frequently billed for overtime.

106.    For example, NATI's Project Manager, Ruest, requested overtime from Contracting Officer's Representative, Andre Proctor, for needing "special access"

107.     However, the contract forbids charging the government overtime simply to perform basic repair that would disturb the productivity of the government employees. This claim exemplifies a practice that the Relator regularly witnessed

while he was working on the site and constitutes fraud. This has gone on for well over a decade.

108.    Other requests similarly claimed overtime due to the needing access.

109.    One request stated that overtime was needed because the work was performed on an "important office with lots of meetings; need to do after-hours to not inconvenience the customer." This is in direct contradiction with the contract language which asserts that the contractor is required to repair such items without charging the Government for overtime.

110.    This practice of fraudulently claiming Overtime was in full effect as early as 1999. As the Monthly Status Report from May 1999 indicates, NATI's requested overtime to "clean 14 vents in occupied space".

111.    However, vents are listed under Attachment 7 and the contract clearly forbids claiming overtime simply because an area under Preventive Maintenance is occupied by government employees during normal business hours.

112.    The employees whose time was fraudulently billed for overtime included Randy Burgess, Herbert Davis, Cedric Davis, John Griffin, Abdul Hakh, Mike Hicks, John Roberts, Shawn Siedel, Douglas Thayer, and Darryl Giles.

113.    Payment of overtime to employees is not the issue under the contract.

114.    It is clear that whether the employees actually worked on their regular schedules or not, the cost should have been borne by the contractor and not the Government.

115.    NATI concealed its total failure to shift workers through the policy of awarding Compensation Time.

116.    Compensation Time refers to an employer giving an employee time off for hours worked overtime in lieu of monetary compensation. Under 29 U.S.C.A. § 207(o), only state or government agencies may legally allow their employees time off in place of wages.

117.    Even then, a public agency may only provide Compensation Time pursuant to the terms of an agreement arranged by the employees or by their union and it must be awarded at the rate of one and one-half times the overtime hours worked and must be taken during the same pay period.

118.    Here, the Central Bargaining Agreement (CBA) with the local union forbids the practice of awarding Compensation Time.

119.    NATI was aware that it was illegal to engage in Compensation Time as early as 1998. In the Status Report of June 1998, NATI's Project Manager, Ruest, admits to NATI's President that Compensation Time is no longer authorized.

120.    The report states, "The union's position, as stated in their 10 June letter, is that this practice is not allowed by the CBA, Article II, Section 2. As a result, compensation time is no longer authorized."

121.    Although NATI knew of the illegality of Compensation Time, time sheets demonstrate that they were continuing with the policy well into 2001 and 2002. The Relator collected time sheets which indicate that employees were required to fill in boxes marked "Compensation Time Accrued" and "Compensation Time Used". The time sheet for J. Griffin shows that in 2001 and 2002, well after the practice of Compensation Time scheme was supposed to have ceased, employees

were forgoing pay for overtime and were instead taking time off for extra hours worked.

122.    A timesheet from employee Gene Drumheller, dated November 16, 2002, has a handwritten note from John Carothers instructing the employee to take Compensation Time.

123.    The note explains that since Drumheller worked eight hours of overtime in a normal forty-hour work week, he should subtract those from another week and only work thirty-two.

124.    NATI circumvented the contract requirements of shifting personnel by using Compensation Time to perform maintenance after business hours.

125.    NATI facilitated the fraudulent billing for overtime by obfuscating the hours that workers were really supposed to be working.

126.    The Relator's information is that this practice of knowingly, willfully and recklessly charging the government for work on an overtime basis which should not have been charged as overtime continues under the CTSI contract.

127.    Damages to the Government include, but are not limited to a fine of up to $10,000 for every timesheet indicative of this Compensation Time scheme. NATI management and employees knew that this was unacceptable practice because every timesheet had a "Policies and Procedures" document attached at the end, specifying that all hours worked over 8 in a day or 40 in a week should be entered as overtime.

## F. NATI AND CTSI MISREPRESENTED THE EXTENT OF THE MAINTENANCE THEY WOULD PERFORM

128.    NATI maintained the USDA complex at an unacceptable level of disrepair. Section J, 2105A Summary – Annual Man-Hour Requirements of the NATI contract and Attachment 7 of the CTSI contract list specific type of equipment, the number of pieces of each type of equipment existing in each building, the frequency with which each piece of equipment is to be inspected according to its specifications, and the man-hours necessary for each inspection.

129.    Over the entire USDA complex, the hours contracted for Preventative Maintenance total 18,227.31. However, at least 10,237.66 of these contracted man-hours were simply not completed.

130.    The following spreadsheets list the items which were specifically required to be maintained under the contracts which were either totally ignored or were only allotted a fraction of the contracted time:

| Guide No. | South Building | Freq. | Quantity | Manhour | Total M/Hrs |
|---|---|---|---|---|---|
| A-08 | Air Conditioner, window unit | 1 | 415 | 2 | 830 |
| A-13 | Module Air Conditioners | 12 | 15 | 3 | 540 |
| AE-4 | Mudleg | 2 | 277 | 0.5 | 277 |
| F-05&06 | Fire Pump (motor or engine driven) | 12 | 4 | 1 | 48 |
| I-03 | Window Induction Units | 1 | 3342 | 0.4 | 1336.8 |
| L-02 | Loading Ramp, Adjustable | 4 | 6 | 1.25 | 30 |
| L-04 | Lighting, Outside | 2 | 273 | 1 | 546 |
| L-03A | Lighting Special Fixture Café Dome | 1 | 496 | 0.5 | 248 |
| L-03B | Lighting Special Fixture Jeff. Aud | 1 | 90 | 0.5 | 45 |
| L-03C | Lighting Special Fixture Stairwell Lights | 1 | 228 | 0.5 | 114 |
| L-03E | Lighting Special Fixture Exit Lights | 1 | 299 | 0.5 | 149.5 |
| L-03F | Lighting Special Fixture Signs & Bull. Brd. | 1 | 58 | 0.5 | 29 |
| L-05 | Lawn Sprinkler start up, insp., shut down | 1 | 4 | 0.25 | 1 |
| M-02 | Manhole Sewer | 4 | 11 | 2 | 88 |
| M-03 | Motors 1HP to 100Hp | 1 | 327 | 0.4 | 130.8 |

| Guide No. | | Freq. | Quantity | Manhour | Total M/Hrs |
|---|---|---|---|---|---|
| R-05 | Refrig. Machine centrifugal up to 250 tons | 1 | 2 | 28 | 56 |
| S-08 | Strainer, Y type up to 2" | 1 | 198 | 0.5 | 99 |
| S-09 | Strainer greater than 2" | 1 | 156 | 2 | 312 |
| T-08 | Steam Traps | 0.5 | 493 | 0.5 | 123.25 |
| V-03 | Valve, regulating | 1 | 51 | 0.6 | 30.6 |
| V-06 | Valve, motor operator | 1 | 257 | 0.4 | 102.8 |
| V-09 | Backflow preventor valve | 1 | 33 | 2 | 66 |
| V-5A | Valve, steam | 0.2 | 422 | 0.4 | 33.76 |
| V-5B | Valve, city water | 1 | 68 | 0.5 | 34 |
| V-5C | Valve, hot water | 1 | 17 | 0.5 | 8.5 |
| V-5D | Valve, compressed air | 1 | 11 | 0.5 | 5.5 |
| V-5E | Valve, condensate | 1 | 275 | 0.4 | 110 |
| V-5F | Valve, CHW Central Plant | 1 | 323 | 2 | 646 |
| V-5G | Valve, CHW sub-central | 1 | 114 | 2 | 228 |
| W-01 | Drinking water filter system | 12 | 4 | 3 | 144 |
| W-04 | Filter, water | 2 | 25 | 0.5 | 25 |
| TOTAL: | | | | | **6437.51** |

| Guide No. | Whitten Building | Freq. | Quantity | Manhour | Total M/Hrs |
|---|---|---|---|---|---|
| A-08 | Air Conditioner, window unit | 1 | 28 | 2 | 56 |
| A-13 | Module Air Conditioners | 12 | 1 | 3 | 36 |
| AE-4 | Mudleg | 2 | 92 | 0.5 | 92 |
| F-05&06 | Fire Pump (motor or engine driven) | 52 | 2 | 0.6 | 62.4 |
| I-03 | Window Induction Units | 1 | 727 | 0.4 | 290.8 |
| L-04 | Lighting, Outside | 2 | 67 | 1 | 134 |
| L-03A | Lighting Special Fixture Café Dome | 1 | 183 | 0.5 | 91.5 |
| L-03C | Lighting Special Fixture Stairwell Lights | 1 | 63 | 0.5 | 31.5 |
| L-03E | Lighting Special Fixture Exit Lights | 1 | 77 | 0.5 | 1 |
| L-03F | Lighting Special Fixture Signs & Bull. Brd. | 1 | 14 | 0.5 | 7 |
| L-05 | Lawn Sprinkler start up, insp., shut down | 2 | 3 | 0.25 | 1.5 |
| M-02 | Manhole Sewer | 4 | 4 | 2 | 32 |
| M-03 | Motors 1HP to 100Hp | 1 | 87 | 0.4 | 34.8 |
| R-05 | Refrig. Machine centrifugal up to 250 tons | 1 | 2 | 20 | 40 |
| S-08 | Strainer, Y type up to 2" | 1 | 43 | 0.5 | 21.5 |
| S-09 | Strainer greater than 2" | 1 | 16 | 2 | 32 |
| T-08 | Steam Traps | 0.2 | 104 | 0.5 | 10.4 |
| V-03 | Valve, regulating | 1 | 19 | 0.6 | 11.4 |
| V-07 | Valve, pneumatic | 1 | 39 | 1.5 | 58.5 |
| V-09 | Backflow preventor valve | 1 | 7 | 2 | 14 |
| V-5A | Valve, steam | 1 | 32 | 0.4 | 12.8 |
| V-5B | Valve, city water | 1 | 30 | 0.5 | 15 |
| V-5D | Valve, compressed air | 1 | 20 | 0.5 | 10 |
| V-5E | Valve, condensate | 1 | 40 | 0.4 | 16 |
| V-5F | Valve, CHW Central Plant | 1 | 83 | 2 | 166 |
| V-5G | Valve, CHW sub-central | 1 | 114 | 2 | 228 |

| W-01 | Drinking water filter system | 1 | 31 | 3 | 93 |
|------|------------------------------|---|----|---|----|
| W-04 | Filter, water | 2 | 6 | 0.5 | 6 |
| TOTAL: | | | | | **1605.1** |

| Guide No. | **Yates Building** | Freq. | Quantity | Manhour | Total M/Hrs |
|-----------|--------------------|-------|----------|---------|-------------|
| A-07 | Package Unit Computer Room | 12 | 2 | 3 | 72 |
| C-05 | Variable Air Volume Terminals | 1 | 160 | 1 | 160 |
| F-05&06 | Fire Pump (motor or engine driven) | 12 | 2 | 0.6 | 14.4 |
| I-02 | FCU, Under Window Type | 1 | 481 | 0.4 | 192.4 |
| L-02 | Loading Ramp, Adjustable | 4 | 1 | 1.25 | 5 |
| L-04 | Lighting, Outside | 2 | 23 | 1 | 26 |
| L-03A | Lighting Special Fixture | 1 | 895 | 0.5 | 447.5 |
| L-03E | Lighting Special Fixture Exit Lights | 1 | 82 | 0.5 | 41 |
| M-02 | Manhole Sewer | 4 | 3 | 2 | 24 |
| M-03 | Motors 1HP to 100Hp | 1 | 46 | 0.4 | 18.4 |
| R-05 | Refrig. Machine centrifugal up to 250 tons | 1 | 2 | 28 | 56 |
| R-06 | Refrigeration Controls | 1 | 2 | 20 | 40 |
| S-08 | Strainer, Y type up to 2" | 1 | 7 | 0.5 | 3.5 |
| S-09 | Strainer greater than 2" | 1 | 19 | 2 | 38 |
| T-08 | Traps, all types | 0.25 | 12 | 6.25 | 18.75 |
| TOTAL: | | | | | **1156.95** |

| Guide No. | **Cotton Annex Building** | Freq. | Quantity | Manhour | Total M/Hrs |
|-----------|---------------------------|-------|----------|---------|-------------|
| E-19 | Emergency Lights | 4 | 17 | 0.2 | 13.6 |
| E-35 | Motor Control Center | 2 | 3 | 3 | 18 |
| F-05&06 | Fire Pump (motor or engine driven) | 12 | 2 | 0.6 | 14.4 |
| L-04 | Lighting, Outside | 2 | 23 | 1 | 46 |
| L-03C | Lighting Special Fixture Stairwell Lights | 1 | 31 | 0.5 | 15.5 |
| L-03E | Lighting Special Fixture Exit Lights | 1 | 38 | 0.5 | 19 |
| M-02 | Manhole Sewer | 4 | 2 | 2 | 16 |
| M-03 | Motors 1HP to 100Hp | 1 | 45 | 0.4 | 18 |
| R-05 | Refrig. Machine centrifugal up to 250 tons | 1 | 2 | 28 | 56 |
| S-08 | Strainer, Y type up to 2" | 1 | 42 | 0.5 | 21 |
| S-09 | Strainer greater than 2" | 1 | 3 | 1 | 3 |
| TOTAL: | | | | | **240.5** |

| Guide No. | **South Building 3rd and 4th Wing & S-502** | Freq. | Quantity | Manhour | Total M/Hrs |
|-----------|---------------------------------------------|-------|----------|---------|-------------|
| AHU | Air Handler Unit | 4 | 16 | 10 | 640 |
| EXPTNK | Expansion Tank | 1 | 4 | 6 | 24 |
| FCU | Fan Coil Unit | 2 | 14 | 1 | 28 |
| FD | Fire Damper | 0.5 | 504 | 0.2 | 50.4 |
| FJPMP | Fire Jockey Pump | 12 | 1 | 0.6 | 7.2 |
| FPMP | Fire Pump | 12 | 1 | 0.6 | 7.2 |
| HWH | Hot Water Heater | 1 | 18 | 0.6 | 10.8 |

| PKAC | Package A/C Unit | 2 | 6 | 2.5 | 30 |
| TOTAL: | | | | | **797.6** |

131.    For example, the South Building has 415 air conditioning window units listed as Guide Number A-08. NATI contracted to conduct a two-hour inspection and repair on each unit every year, constituting a total of 830 man-hours a year. In reality, NATI employees routinely skipped the two-hour inspection which should have involved dismantling the unit from the wall.

132.    Instead, NATI would merely change the filters, which would only take a maximum of 15 minutes and they did not always perform even this duty in response to the requirement that they maintain the machines yearly.

133.    Therefore, the air quality in the building would suffer, endangering the health of government employees, the life span of the building, and reducing the operational years of the machines.

134.    The South Building also contained 15 Module Air Conditioners that were supposed to be inspected for three hours on a monthly basis.

135.    Regarding this equipment, the required scheduled shutdowns never occurred, and instead of inspecting the equipment every month, NATI only conducted an inspection when a problem was reported. Even when inspections did occur, they were never in full accordance with the specifications listed in the contract under section A-13.

136.    NATI never inspected any of the manholes on the USDA complex. Contractors are required to conduct quarterly inspections of the Manhole Sewers on site.

However, not only did NATI totally fail to conduct these inspections, NATI did not even possess the equipment necessary to conduct such inspections.

137.    Other violations to maintain equipment according to the specifications occurred with the Window Induction Units (specification listed at I-03), the Lighting (L-04, L-03A), the Strainers (S-08, S-09), and Valves (V-5F). The equipment kept in disrepair throughout the South Building was also kept in disrepair in Whitten, Yates, and Cotton Annex buildings.

138.    The Relator's information is that NATI's practice of knowingly, willfully and recklessly not performing the standard maintenance required continues under CTSI which is managed by the same personnel at the same site.

139.    The damages to the Government include, but are not limited to, the entire cost of the contract, which over the five years amounts to $10,824,660.00.

140.    Each year, NATI was awarded $2,164, 932.00 to provide "all management, supervision, repair parts, tools, and equipment for operations and maintenance services at the USDA Headquarters complex".

141.    The failure to provide all these obligations places NATI and CTSI in violation of the entire contract.

## (VIOLATIONS OF THE FALSE CLAIMS ACT)

## COUNT I

142.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

143. The defendants knowingly, willfully and recklessly claimed bonuses under the contracts for Operations and Maintenance based on response times and completion times for repairs in the USDA facilities.

144. The defendants claimed to earn such bonuses based upon falsely stated response times which were locked into the computer and did not reflect actual response or repair time.

145. Therefore, each of the above-named Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for bonuses that they claimed to have earned in accordance with the Operations and Maintenance contracts when in fact they knowingly altered the record of the response times.

146. As a result of Defendants' actions, the United States has directly or indirectly paid monthly bonuses throughout the life of the contracts and spent millions of dollars as a result of Defendants' fraudulent and/or illegal conduct pursuant to the Government bonuses.

147. Damages to the Government include, but are not limited to, the full value of the bonuses and a fine for each an every claim of a response time which was falsified under the contract of up to $10,000 per such false claim.

## <u>COUNT II</u>

148. The allegations contained in the paragraphs above are hereby re-alleged and set forth full as above.

149. The defendants knowingly, willfully and recklessly misrepresented non-reimbursable Basic Service repairs to be reimbursable Minor Repairs.

150.    By making such misrepresentations, including aggregating small repairs in violation of the Operations and Maintenance contract, and by simply inflating the value of the minor repairs, the defendants were able to collect additional money for work they were already contracted to perform and paid to perform.

151.    The defendants were able to earn more than one million dollars above the amount they were allocated for routine repairs through this process of misrepresenting routine repairs as worthy of reimbursement under Minor Repair Work Orders.

152.    Therefore, each of the above-named Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed under Minor Repair Work Orders that they should have performed as standard maintenance in accordance with the Operations and Maintenance contracts when in fact they knowingly altered the size of the repairs required.

153.    As a result of Defendants' actions, the United States has directly or indirectly paid twice for repairs, once as part of standard maintenance and again because the payment for a Minor Repair Work Order is in addition to such standard repairs as a result of Defendants' fraudulent and/or illegal conduct.

154.    Damages to the Government include, but are not limited to, the full value of the falsified Minor Repair Work Orders and a fine for each an every Minor Repair Work Order which was falsified under the contract of up to $10,000 per such false claim.

## COUNT III

155.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

156.    Both NATI and CTSI charged the Government for work performed by workers who did not possess the qualifications required by contract.

157.    For example, the Relator was the only employee in the electrical department who possessed an appropriate license and neither did the PAE electrical workers have appropriate licenses.

158.    All the work conducted by electrical workers and others who were not properly licensed as required under the contract has been falsely certified with respect to the Operation and Maintenance contract, constitutes a misrepresentation to the Government, and amounts to a false claim.

159.    Therefore, each of the above-named Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for work that was supposed to be conducted by appropriately licensed personnel which was in fact not conducted by licensed personnel, as well as the costs to repair the physical damages to buildings and equipment as a result of using non-licensed personnel to perform the work, plus a civil penalty for each and every charge made by the defendants for specific repair which was performed by unlicensed workers of up to $10,000 per such false claim.

## COUNT IV

160. The allegations contained in the paragraphs above are hereby re-alleged fully as set forth above.

161. NATI and CTSI fraudulently billed the Government for overtime for work that the contracts specifically excluded from overtime.

162. The Operations and Maintenance contracts list specific equipment that cannot be worked on during normal working hours to avoid interfering with Department of Agriculture business. These tasks must be performed after normal business hours at no additional cost to the government.

163. The Defendants did not shift workers as required under the contract but engaged in a scheme to charge the government for overtime by making false claims including falsifying records, providing workers with Compensation Time which is also prohibited on the record, and simply charging for overtime when overtime is not allowed under their contracts.

164. Therefore, each of the above-named Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for overtime work that was supposed to be conducted as non-overtime work or when the overtime costs were supposed to borne by the contractors.

165. Damages to the Government include, but are not limited to, the full value of the overtime payments as well as a fine for each and every charge made for overtime by the defendants for work which should have been charged to the government as

non-overtime work or included in the standard maintenance of the contracts of up to $10,000 per such false claim.

## COUNT V

166.  The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

167.  Over the entire USDA complex, the hours contracted for Preventative Maintenance total 18,227.31. These hours include specific tasks to be completed under the contract which simply were not done, despite the contractors earning contract renewals annually and charging for overtime on other tasks.

168.  The defendants, knowingly, willfully and recklessly did not perform thousands of hours for specific maintenance work required under the contract.

169.  At least 10,237.66 of these contracted man-hours were simply not completed.

170.  Therefore, each of the above-named Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729, by directly or indirectly causing the United States to be billed for specific maintenance work that was supposed to be conducted which they knew was not being conducted.

171.  Damages to the United States include, but are not limited to, the full value of the Maintenance work charged to the Government as it was substantially not performed, the additional costs for equipment that was not maintained and had to be repaired, the long term value of the buildings which were not maintained, and the costs to repair the physical damages to buildings and equipment as a result of the actions of the Defendants plus a civil penalty for each and every specific

maintenance task listed under the contract which was not performed of up to $10,000 under the Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment for all of the following:

a)  That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charges for bonuses they did not earn plus a fine of up to $10,000 for each falsification used to earn such a bonus or in the alternative a fine of up to $10,000 for each monthly bonus falsely earned..

b)  That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' misrepresentations to be paid additionally for Minor Repair Work Orders which should have been done as part of non-reimbursable standard maintenance plus a fine for each such misrepresented charge of up to $10,000.

c)   That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants continued use of non-licensed personnel to perform work under the contracts which were supposed to be conducted by licensed personnel including but not limited to the full value of the Operation and Maintenance contracts and all charges made under those contracts plus a fine of up to $10,000 per charge to the government made by the defendants for work conducted by non-licensed personnel.

d) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' charging for overtime hours that were supposed to be conducted as non-overtime work or when such overtime was supposed to be borne by the contractors, plus a fine of up to $10,000 per false overtime charge.

e) That this Court enter a judgment against the defendants in an amount equal to three times the amount awarded to the defendants under contracts performed as prime or subcontractors to perform specific maintenance as set forth in the Operations and Maintenance contracts which they knowingly, willfully and recklessly did not perform, plus a civil penalty of up to $10,000 for each such specific maintenance task which was not performed as required.

f) That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant to 31 U.S.C. § 3730 subsection (d) (1) (b) and subsection (d) (2).

g) That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims.

h) That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement.

i) That the Relator/Plaintiff be awarded pre-judgment and post judgment interest.

j)  That a trial by jury be held on all issues.

k)  That the United States Government and the Relator/Plaintiff receive all relief, both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully submitted,

_____
Stephen M. Kohn
DC Bar No. 411513
_____
Michael D. Kohn
DC Bar No. 425617
_____
David K. Colapinto
DC Bar No. 416390

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984

*Attorneys for Robert Keith Bender*

August 4, 2006